Chief Judge Kuczynski, Your Honors. May it please the Court. My name is Victoria Iger. I'm here on behalf of the petitioner-appellant, Jonathan Doody. I, my firm of Dershowitz, Iger & Adelson, and Alan Dershowitz have represented Mr. Doody since 1995. We were his counsel on his direct appeal and throughout these habeas corpus proceedings. With the Court's permission, I would like to reserve four minutes' time for rebuttal. Whatever you have left on the clock, if it's not red, if it's red, it's negative numbers. Thank you. This case involves not only an involuntary confession, but very likely a false confession. The task force obtained six confessions in this case, four from the Tucson Four, one from Alex Garcia, and one from my client, Jonathan Doody. Though the State had charged the Tucson Four with the Temple murders based on their confessions, the State ultimately decided that those confessions were false. Ms. Iger, what do we do with the interlocking confession from Garcia, the statement from Rolando Carachea that he loaned the murder weapon to his two roommates, that items taken from the crime scene were found in your client's apartment, that his fingerprints were found on some of the items taken, and he confesses? Why is that not sufficient indicia of reliability to support both the trial court finding and the jury's conclusion that the confession was reliable? Well, I disagree that there was a great deal of evidence against my client. There was no physical evidence. There was no direct connection to the Temple loot. In terms of interlocking confessions and other evidence which might be said to exist, it really doesn't go to the voluntariness question. You said it wasn't reliable, and at this point I'm asking you just about reliability. And why are those five factors not sufficient to corroborate the defendant's own confession that he was involved in the murders? Well, juvenile confessions are particularly unreliable, and I know I'm not answering your question directly. I mean, in essence, you're challenging the sufficiency of both the superior court's factual finding after a 10-day evidentiary hearing and the jury's determination after the trial that the confession was reliable. I'm actually surprised by your statement. I would think you would want to focus on the voluntariness issue. I do wish to focus on the voluntariness issue, and if you'll permit me to, I'd like to move to that without perhaps fully answering your question. Counsel, before you go there, did the jury make a determination that the confession was reliable? We don't know what the jury did. I thought one of the instructions required the jury to find voluntariness if they considered it. There was a very truncated jury instruction asking the jury to consider voluntariness, but it certainly wasn't a voluntariness. Didn't the instruction say that before you can consider a confession against duty, you have to conclude that it was voluntary? It said something to that effect, but the jury certainly doesn't have the benefit of an understanding of the Supreme Court decisions on voluntariness, and I don't think that's a substitute for a proper judicial determination of voluntariness. And if I may, I'd like to make my voluntariness argument at this time. So you're not abandoning your adequacy of the Miranda advisement argument? No, I'm not, and in fact, that's my first argument, because if the Miranda warnings were inadequate and the AEDPA standard was satisfied, then there is an irrebuttable presumption of involuntariness. And these Miranda warnings... It says that there was no evidence, no direct evidence of any connection with the location of the murders. I thought the property found in his apartment was. What did I misunderstand about that? Well, it was property found in Garcia's place, and it was tied to duty only because certain other witnesses, friends of Garcia's and Caracas's, said that they had stolen it from duty. Why don't we let counsel make her argument? Thank you, Your Honor. My first argument is that the Miranda warnings were inadequate and that the Petitioner is entitled to relief on that ground. They were inadequate in two respects, the manner in which they were given and what the Miranda warnings said. They were inadequate because the officers underplayed them and did everything within their power to suggest that they were not important and they were not to be taken seriously, not to be taken out of context, that they weren't heavy or technical. They were just something that had to be done, some kind of bureaucratic paperwork.  Is that what the police said? Excuse me? Is that what the police said? Is that what the police did? Yes, it is what the police did. The detectives, Detective Riley, who administered the warnings. They said, okay, and next one states that you have the right to have an attorney present prior to and during questioning. Now, that far is. Well, and then he elaborates. Just so we're all together. Yes, sir. That far is correct, right? There's nothing wrong with that. That's correct. And what that means, if you want one, you're allowed to have a lawyer here before, during, you know, my questions to you, okay? I think that's all right, too. It's the next sentence. It's the next sentence that says, and then an attorney is a lawyer who will speak for you and help you concerning the crime or any kind of offense that we might think that you or somebody else is involved in, if you were involved in it, okay? It's not necessarily mean that you are involved, but if you were, then that's what that would apply to. And this is a kid who had never heard of the Miranda warnings before, a kid who wasn't born in the United States, who hadn't spent most of his life in the United States. But how do we know he had never heard of Miranda warnings? He said so. He was asked, and he said so. That's his testimony. That was part of his statement. And I can find it. Counsel, is your argument that by saying if you were involved in it, you may have a lawyer present, what they were saying is you can only have a lawyer if you're guilty? Well, I think that is what it suggested, yes, especially to a kid who had never heard of Miranda warnings before. And so I think that the warnings were incorrect, and he is entitled to an irrebuttable presumption of involuntariness. And I think we satisfy the AEDPA standard that is contrary to Supreme Court law, contrary to the Miranda decision, Prysock, Duckworth v. Egan, contrary, Judge Kosinski, I think, to your decision in the Connell case, which found warnings on right to counsel inadequate. I know that's not Supreme Court precedent. Almost. Close to it. Some might say better. And I think we also have an unreasonable application of those cases. The only thing that puzzles me about your argument is that you completely ignored the written warnings that were provided to him, which he signed and indicated that he understood each of those warnings. Why couldn't the fact finder look at the totality of the circumstances, including the fact that he was given written warnings in concluding, in an objectively reasonable manner, that these warnings were adequate? I don't think he was given written warnings. I think the officer told him that he was going to read the form to him verbatim and did not. And I think that as the panel concluded. Are these not his initials? I believe it's Exhibit 159. I think they are his initials, but there is no evidence in the record that he read them. And, in fact, there's no evidence in the record that he was capable of reading them. Counsel, you're asking us to believe, contrary to the testimony of the investigating detectives who administered the warnings and the exhibit itself, that the fact finder's determination that the warnings were adequate are inadequate when your client never testified at the suppression hearing. So why shouldn't we view the evidence in the light most favorable to upholding the trial court and the appellate court's finding that the warnings were adequate? Well, there's no requirement that the defendant testify to raise a Miranda question. And I think that the particular facts of this case, the fact that we have a juvenile, the fact we have an individual whose first language was not English, the fact that we have the officers administering the warnings in a very peculiar and I would say inappropriate manner. But the officers all testified that he read these things, he initialed them, they explained them to him, and that, as far as they could tell, he understood them completely. And a factual finding was made that he did without any contradiction by your client because he didn't testify. Well, I think we find that objectively unreasonable. I think the testimony was only that he appeared to understand them. And I will continue to press my argument that the Miranda warnings were inadequate. But I'd like to move on. You're saying we have to find involuntariness unless the kid passes an LSAT exam or something on Miranda? Your Honor, there is evidence in this record that suggests that there were some intellectual defects. As I said, English was not his first language. When the officers in the beginning of the administration of Miranda Rice, they were asking him some questions about his address. He said he hadn't memorized his address. He couldn't give a full address because he hadn't memorized it. And as to his prior address, which was just earlier that summer, he said he couldn't remember it. So I think there were some indications that this is a kid who had some problem with the English language, whether it was because he left Thailand at a very young age. So I don't think English just had a problem disclosing to the policeman what the addresses were. No. I think at that point he was being cooperative. He gave the partial addresses that he was able to. So I don't think that that's consistent with what the record said. If I may, I'd like to move on to my voluntariness argument, because I think that putting aside the Miranda warnings, this confession was involuntary, and the contrary finding of the Arizona Court of Appeals was contrary to controlling Supreme Court law, an unreasonable application of it, and rested on an unreasonable determination of the facts. Is there a Supreme Court decision that holds that a lengthy interrogation after an adequate Miranda warning is nevertheless involuntary because of facts like the facts in this case? Well, I think that the case is controlled by a set of Supreme Court decisions, the Haley case, the Gallegos case, the Galt case. I would say it's controlled by the Spano case, which is an adult confession. I would suggest it's controlled by Haynes v. Washington, where the coercion was not letting the individual telephone his wife. So I think there is a set of cases that this is contrary to. I also would argue that, as the panel found, it rested on an unreasonable application of the voluntariness rules, which say that a confession is involuntary if the defendant's will is overborne. And to determine that, you've got to look at the totality of the circumstances, the facts of the interrogation, and the particular qualities and vulnerabilities of the defendant who is being questioned. Can we give deference to the Court of Appeals finding that duty was attentive and responsive and that no coercive tactics were used? Well, I don't think so because I think the Arizona Court of Appeals decision contradicts itself on those very points. And to the extent that it doesn't, those are unreasonable determinations given the undisputed record that we have, which is an audio tape of this 12-and-a-half hour interrogation. And a transcript to go with it. So as to those specific points ---- Why isn't there support, any support in the record for the factual determination that he was attentive and responsive and that no unduly coercive tactics were used? Well, he clearly wasn't responsive because if you listen to the case, and I hope you all will, there were long periods of time when he was not responding. And that is ---- I did listen. And those long periods of time when he wasn't responding were when the policeman was just chattering on endlessly so the kid doesn't interrupt the policeman while the policeman talks and talks. Well, I think you raise an interesting point. This is a kid who is respectful of authority, and that's also a quality that should have been considered in the totality of the circumstances. It's not as though the policeman asks them a question and they both sit there silent for three minutes. The policeman chatters for three minutes. Well, I ---- And the kid doesn't interrupt them. I wouldn't call it chattering. I would call it ---- I would call it harassing. I would call it harassing. I would call it browbeating. I would call it subjecting him to a barrage of questions. The Arizona Court of Appeals, which listened fully to the tapes, called it ---- they didn't use the word weedling. It was something like ---- They called it courteous, almost pleading. I think those were the words. But courteous is not inconsistent with coercive because you can put a gun to someone's head and say, please give me your wallet, and it's quite courteous, but it's coercive nonetheless if you look at the surrounding circumstances. And this pleading wasn't, you know, please, please do me a favor. This was insistence that this kid answer the questions, and it was telling him over and over again that this questioning was going to continue until those questions were answered, and it did. And it continued until he implicated the Tucson Four, gave descriptions of them, said what they were wearing, what vehicles they were driving, and it continued on and on and on for hours and hours after that. And that's coercive. I think it would be coercive to an adult. It's certainly coercive to a juvenile where special care must be taken in evaluating the circumstances. Obviously, you're very strongly held view of it, but our question is whether the court of appeals determination was based on a record. And I come back to the same question. Why isn't there some factual support for its determination that they weren't being unduly coercive? Because I think that's ultimately a legal conclusion. It's not a factual conclusion. The historical case authority for that. I agree with you completely. Voluntariness is a legal issue. We're talking about a finding about coerciveness, about his understanding, and about whether his will was overborn. Well, let me take the last part of it in terms of his will being overborn. And I'd like to tell you a little bit about what the record says. And this is something I noticed only the last time that I listened to the interrogation tapes. These officers knew exactly what they were doing. They knew that to get a confession, they would have to overbear his will. And each one of them said so. Munley was the first one. I feel bad for you because you just sit there with all that information locked up inside you, and you don't want to share it with us. Page 8 of the transcript of tape 7. Wiley uses the word overcome. He says to Jonathan Doody, what is it that is so unbearable for you to overcome? On the next page, what could we do? I'm sorry? What are we supposed to take from that? Well, I think you could take from that that these officers knew that to get a confession, they were going to overbear the will of this individual. These officers recognized that this kid did not want to answer their questions, and they used every trick in the book, including continuous interrogation for hours upon hours, two, three, and four interrogators in the room at any particular time, no parent present, custodial interrogation, which is something that the Arizona courts did not consider at all. Well, they did make a finding that he had waived the presence of his parents, did they not? They said that it didn't enter into the, something to the effect that it didn't enter into the voluntariness of the confession because he had not requested a parent be present. And he was advised, both verbally and in writing, that he could have his parents there if he wanted, but he. . . He said it didn't matter. Right. The officers may know it, well, it doesn't matter, I'm not sure what that means. It doesn't matter because he didn't know where they were. It doesn't matter. He never said, I don't want them here. If it's equivocal and the state finder of fact says he waived the presence of his parents, why under AEDPA don't we have to defer to that finding if there's evidence in the record to support it? Because I don't think that the Arizona court even applied the totality of the circumstances test. What the Arizona court of appeals seemed to do was take each individual factor, kick it off and say that in itself doesn't lead to a finding of voluntariness, the absence of a parent, the length of the interrogation. But the totality of the circumstances test, if it means anything, means that you can't consider the factors in isolation. It's the totality of the circumstances that have to be considered. And I don't think we have any problem meeting the AEDPA standard because the hurdle that AEDPA erects is not so very high. And I think in arguing for en banc rehearing, my adversary relied upon a First Circuit case, but it was overruled. The increment of incorrectness need not be great. That's the First Circuit en banc. And the Second Circuit has said pretty much the same thing in a decision on the panel in which Judge Sotomayor sat. And they said, after saying that the increment of incorrectness beyond error need not be great, otherwise habeas relief would be limited to state court decisions so far off the mark as to suggest judicial incompetence. And the AEDP did not restrict federal habeas corpus to that extent. And I think Williams v. Taylor itself says that because in that case, the Supreme Court rejected the Fourth Circuit's no reasonable jurist test and adopted a standard that was much less deferential, and the holding of the Williams v. Taylor case is to the same effect because there the Court held that the prejudice prong of the Strickland test had been met because the state court had failed to consider the totality of the mitigating evidence and had improperly weighted in determining prejudice. Ms. Iger, could you help me with the Arizona Court of Appeals opinion? I'm referring to 187, Arizona, at page 372, in which the Court says, and I quote, Again, considering the circumstances in their totality, we conclude that the trial court did not err in determining that the officer's advised duty of his Miranda rights in a clear and understandable matter, and that duty made a knowing and intelligent waiver. Isn't that the application of the totality of the circumstances test of the confession? No, respectfully, Your Honor. No, because everything that preceded it suggested that the Court didn't apply a totality test that it considered. So doesn't that language discuss only the Miranda issue and not the involuntariness issue? Well, I think that the Court of Appeals did refer to totality in regard to the voluntariness issue as well. But it can't be the case, and it's not the case under AEDPA, that merely referring to the appropriate Supreme Court test is sufficient. There is one test for voluntariness of confessions, and it applies to state cases and Federal cases. And this is not like ineffective assistance where there is some local variation, some community standards. An involuntary confession is inadmissible in evidence in the state courts and the Federal courts, and there is no principle more firmly established, and there is no – and I think it's your obligation to apply it. And I think that if AEDPA erects some standard of incorrectness that is larger or greater than the incorrectness in this case, then AEDPA is unconstitutional, and this en banc court should so hold. Wow, that's a tall order. Why not? But I don't think you have to do this, because I believe under the – Why don't you explain to me, just plain English, why we don't have to do this? I mean, why that – I mean, we have a finding from the state court that this was voluntary. And don't we have to basically say they must have been drunk or crazy to do this? No, because the Supreme Court rejected the no reasonable jurist test. That's clear. And I think under AEDPA, you have an obligation, a responsibility, constitutional obligation to grant habeas corpus relief where the requirements of 2254 D.1 or D.2 are satisfied. And in this case – That's not English. I asked you plain English. I'm sorry. I've been a lawyer too long. Just explain to me. It's wrong. Just plain English. I can't tell you how unusual it is for a defense lawyer to tell me that it's wrong, what the court of conviction did. It happens so rarely. But if we get past the fact that you think it's wrong and you don't buy it, how do we get past – But that's always the case where your federal habeas jurisdiction is invoked. And AEDPA did not eliminate your habeas jurisdiction. Well, we don't always find the other way. How do we do it in this case? What is it in this case? There's lots of stuff here that would support a finding of involuntariness. The kid was young. It was a long time. They held him in a room. But there's also stuff going the other way. He was given bathroom breaks. He was given food. He was given drink. He was treated politely. Nobody yelled at him. Nobody hit him. There's nothing – So how do we come to join you in your conclusion and say, boy, the state judge is really wrong? Well, first I have to take issue with your description of the facts. He wasn't given food. And this whole long night, he wasn't given food. He was – they told him that if you want food, you can ask for it. But he was never – there were no sandwiches in the room. It's not true that they didn't yell at him. It was a catered affair, huh? I mean, I don't understand. If they say, look, you want food, you can have it. They say, if you want food, you can have it. Do they actually have to sort of bring it in here and sort of have him insist, no, no, take it away? No, Your Honor. But through this long night, he's brought in after 9 o'clock on a day when presumably he'd been in school all day, went to a football game. The whole night from 9.30 until 10 in the morning, he gets two cans or bottles of soda, two cans of sugar water. It's not true that he wasn't yelled at. Some of the questioning and much of it was pleading, but in a kind of hypnotic way, I think, you know, that this drumbeat over and over and over again was itself coercive. And there were – Counsel, I can see that. You know, I actually – I think there's some strength to your argument that it's coercive and involuntary. But I keep coming back to the problem. And several of us have asked you about it, and I still don't understand the answer. You can go either way. It's a long time to have these boring policemen talk at you, and they just keep going. I'm not too impressed with the catered lunch idea. But, gee, it is a long time to sit there and have police talking at you. On the other hand, it's not as though the kid has trouble staying awake and they're keeping him awake. You never brief an argument that sleeplessness caused undue pressure. And this kid says he gets to work around noon because he's a late riser in his own testimony, or rather in the interrogation. It looks like it could go either way. It went that way. And that's the end of it if there's a record to support what the state court did. How long are you planning on saving for rebuttal? Four minutes, Your Honor, and I'm just about there. Thank you very much. May it please the Court. My name is Joe Maziarz. I'm an assistant Arizona attorney general representing respondents in this matter. There are two interrelated issues before the Court, the first being whether the Arizona Court of Appeals finding that Doody was advised of and waived his Miranda rights is an unreasonable application of Supreme Court precedent, and the second being whether the Arizona Court of Appeals determination that Doody's resulting statements were voluntary under the 14th Amendment is an unreasonable application of Supreme Court precedent. In addressing these issues, it's imperative that the Court understand the context in which this interview took place. The police had arrested and the state had formally charged four individuals they believed were responsible for these robberies and murders, the so-called Tucson Four. There were confessions for those suspects as well. Yes, there were. Were they the same officers who questioned Mr. Doody? Were they the same officers who questioned the Tucson Four? I believe Detective Riley was involved in parts of the interview of two of them and Detective Sinsomba in one of those. And if we had that case here, you'd be making the same argument. How could we reverse the Arizona courts? Well, that case is not before you. I know. Would that be your argument? Well, it would depend on the facts. I'm not aware of the specific facts of those interviews, but be that as it may, I think it's important to realize. They got, what, five confessions and then they threw them out? Four. The Tucson Four. They confessed and they filed on them and everything, and then all of a sudden confessions are false. Well, they filed charges, but the Tucson Four, and I don't want to go outside the record, but the Tucson Four immediately recanted and the physical evidence didn't support any of their confessions. So this was early on. They'd only been charged. It shows that these cops there in Tucson are pretty good interrogators. Well, this was Phoenix area, but this was the Phoenix area, not Tucson. Phoenix, okay. I get the two confused, like Los Angeles and Fairbanks. Understandable. Their track record wasn't so good. Their track record was bad, yeah. Thank you. But again, that was not presented at the suppression hearing, anything about the Tucson Four. He was allowed to present that at trial. Didn't Mr. Diddy confess to having worked with the Tucson Four and having seen the Tucson Four? No, no, he did not. Well, yeah, he did. He talked about the Tucson Four being involved. He did not. He never, first off, he never confessed. What he made were. . . Well, no, you're right. He didn't really confess, Diddy, right. But he did say they were involved. No, he didn't. He said, in fact, he said, let me give you the cites. Diddy said the Tucson Four had nothing to do with the murders, tape 11, page 11. Two pages later, page 13, he claimed, much to the consternation of the detectives, that part of the plan was for them to false confess. But they kept asking him, was there a black man there? Wasn't there a black man there? And he finally said, yes, there was a black man there. Even though he knew there wasn't one. Right. Well, he. . . He insisted that there was a black man that was involved. Well, he never said. . . He was very vague. He made these people up, and he was very vague in his descriptions. He said there might have been Mexican. They might have been black. Because the police were asking him about the ethnicity of the people who were involved and kept insisting, wasn't there a black man? They kept saying, wasn't there a black man? Well, no, if I might. Where in the record is that? Let's just go to the record. Where is that part of the interrogation in the record? Tape 11, page 11, page 13. In the excerpts? No, it's not. It's exhibit. . . The tapes, I believe, are exhibit M that was submitted to the district court. And I know I forwarded the tapes. . . Isn't there an ER number? No, it's not in the excerpt of record. Well, wait a minute. But I know at the request of the clerk's office before the three-judge panel, I submitted the complete tapes and I believe also the complete transcripts to the court. Did you listen to the entire tapes? Yes, I did. Long interview. Anyway, the closest, and getting back to your question, Judge Rawlinson, the closest he comes to identifying or implicating the Tucson Four is tape 16, pages 11 through 16. He's shown photographs of the Tucson Four, and he says one of them, quote, looks familiar, unquote. That's the closest he comes. Before he was even shown the photographs, wasn't he asked about the involvement of a black man? He was asked to describe the people he had made up that were involved, and then he gave vague descriptions. And then, yes, the police did attempt to. . . Was that the question? What were the people he made up who were involved? Are you telling us that he must have made them up? Yes, there seems to be a lot of false factual data that he gave forth during this. . . Yes, yes, everything he said was a lie, practically. But he initially says there were five individuals. He named some of them, and some of them, he says, were friends of this Gonzales character from the west side, gang member, friends of his. He's very vague on whether they're Hispanic, whether they're black. He said he didn't get a . . . But that's because he was asked. He was asked, wasn't there a black man? Point blank, he was asked, because he never described a black man, a sua sponte. So the police asked him, wasn't there a black man? Because they knew one of the Tucson Four was black. Right. Well, again, his description is vague. And they said, well, was one of them black? And he said, well, I'm not sure, Hispanic, perhaps black. And then after that, the police did attempt to tie in the Tucson Four. But, again, he never says, yeah, the Tucson Four was involved. The closest he came when he says one of them looked familiar. Now, you said you listened to the tapes. Yes, I did. There's sort of a gap where he's just silent. There's several, yes. Right. So why isn't that tantamount to invoking his right to remain silent? Well, Davis v. United States, I believe, is on point and dispositive. Once you have a Miranda waiver, and I haven't covered that yet, but this is a rock-solid Miranda waiver. Once you have that, a suspect or a person being interviewed, interrogated, must unequivocally invoke the right to remain silent, the right to counsel. That never happened. How would Doody know how to do that? He was told, if you can stop questioning at any time. Yes, and he was also told, you're going to be here all night. I'm not going to let you leave unless you answer the questions you've got to answer me. That was in the context of Detective Sensenbaum. This is at Supplemental Excerpts of Record 14 at page 2. Sorry. Again, this is tape 9 at page 3, where Detective Sensenbaum is questioning him, and Doody is implying that the life of his girlfriend and family have been threatened. And Detective Sensenbaum tells him, why are you scared to tell us? I'm concerned about you, and I'm going to stay here until I get an answer. Why are you scared to tell? Let me help you on this, John. John, why are you scared to tell us? He's not pleading with him to confess or to say what you did. He's pleading with him to... He's pleading with him to talk. I'm not sure I think the State Court of Appeals statement that it was polite and it was courteous in pleading. He's not pleading with him to, you know, let him help him. He's trying to get him to confess. Well, at that point, I believe, and if you read it in context, I think it's clear... How can you break this up into context? If you look at the context of the whole thing, he's being held for 12 hours overnight while a series, I think up to three police officers, are trying to get him to confess to a crime. They're trying to get information out of him, and initially, I hadn't covered this yet, he was not a suspect, he was not in custody. They simply learned, they believed they had the actual killers in custody. They simply learned that a rifle that a friend of his had was the murder weapon, and this friend Karakachia had said that the rifle had been loaned to Duty and a friend of his named Alex Garcia around the relevant time frame. The officers asked Duty if he would come in for an interview to help them out with this, and they, of course, didn't know whether Karakachia was telling the truth. The record from the suppression hearing shows that he had prior burglary convictions or he was involved in prior burglary. So they didn't know whether Karakachia was telling the truth, but they had to run that lead to ground. So it wasn't until well into the interview where they start to believe that Duty may have, in fact, been involved, and that's probably when he actually admits well in it. What do we make of the fact that they got the stepfather out of town? They didn't. That is a factual finding that has no support in the record. The detectives testified that there was no plan to get rid of him. The person that took care of paying him for coming and his gas money was not even involved in the investigation. He was simply involved in the administrative function. There is that finding. No, there's not. There is no finding. The state court refused to address that issue, saying that it doesn't matter. Since Duty didn't know that, it couldn't have no influence on whether his... No, what I'm saying is that it could have influenced what the suspected knowledge that the police had. You're saying that they didn't really think Duty had necessarily anything to do with it. Well, two points. It would suggest otherwise. Obviously, if Duty wasn't aware of it, it couldn't have any influence. But second, there's no finding in the record that they did that on purpose, that they purposely rushed his father out of town. His father was already leaving town that day. The only thing the record shows was Detective Sensabaugh was going to have lunch with him, but he got busy with the case and didn't show up for lunch, and then the dad and the younger brother went on their way. There's no finding that they purposely made him unavailable. And again, Duty was advised of his right under state law to have a parent present. You're missing my point. It's what the knowledge of the police was at the time that they brought Duty in. Okay, first off, again, there's no factual finding that the police had that knowledge that the father wanted, that someone else involved got rid of him. But even if they did, it's what Duty knew that affects his waiver. Well, yeah, but I'm just making a different point. You said that the cops didn't really even necessarily suspect Duty of anything. Right. They didn't. Again, here's a law-abiding citizen, 17-and-a-half-year-old young man, commander of the ROTC Color Guard and Honor Guard. They have to check the leads. They can't simply say, well, Takarachi, we don't believe you. They know this is the murder weapon. They've got the murderers in custody. They need to figure out how that rifle got to the Tucson 4. And Duty had been interviewed about a month before. He was very cooperative, very helpful. In fact, provided the phone number or address for his dad in Colorado, so that Detective Sensabaugh could contact him, and he came down for an interview. So, you know, initially, this clearly was not custodial. He wasn't a suspect. Obviously, during the course of the interview, that changed. What part of the court of appeals decision are you relying on to support your position regarding Mr. Duty's father? Okay. Let's see if I can find that real quick. ER 17, footnote 5. Footnote 5 of the Arizona Court of Appeals? Yes. They specifically say we don't address this because since it had – he wasn't aware of it. He couldn't have any influence on his – the voluntariness of his way there. But it didn't make a rule in one way or another regarding the intent of the officers or who was involved – the representations you made regarding a different person being involved? The court made no findings of that nature, did it? It didn't specifically. But the officers testified at the hearing that they did not do anything to get rid of the father. And no one – there's no evidence to the contrary. Again, Duty didn't testify. He presented no evidence on that point. That fact is uncontroverted in the record. Counsel, you've heard my questions of your opposing counsel with regard to the factors corroborating the reliability of Duty's statement. Did I miss anything? Is there anything else that you would point to that corroborates what he told the police? Your Honor, I don't think that goes to the voluntariness. I think that goes to our alternative harmless error argument. I think the fact that his statements are corroborated doesn't go to whether they're voluntary or not. That certainly goes – and I was going to – time permitting, I'll discuss that. I know I briefed it. Counsel is pressing quite vigorously that the confession is not reliable. And we spent a lot of time talking about the Tucson 4, which in this judge's view is a complete red herring. But I'd like to know what other factors you would point to that corroborated the reliability of the confession that Mr. Duty gave. Well, first off, again, there's no confession here. They're all self-exculpatory statements. And I don't believe they're reliable because they're all self-exculpatory. According to Duty, he said, we went there for an intrusion alert to test the security system. That was all we were supposed to do. We made it through without setting off the sensors. And these other guys who he makes up went in, and I just followed him in. They told me to go outside. I heard a gunshot. I came in. They were shooting everyone. And then we took the stuff and left. So his statement is totally self-exculpatory. The only part, if you want to call it reliable, is his admission that they borrowed the rifle during the relevant time frame. And contrary to the panel's decision, that didn't happen six or six-and-a-half hours in. That happened three hours in, that he admitted borrowing the rifle. Initially he said it was in June. Was it after the officer said that there's an inconsistency? Yes, yes. In the R&R, the magistrate noted that it was actually three hours in. This is a continuing half-hour discussion. So it's not connected to the murders at all. There was no connection to the temple or any of the other participants at that point. At that point, no, just the rifle. At that point it was just the rifle, and it was a different time frame. No, no, no. It was the relevant time frame. Within half an hour of him initially saying in June, and if I might explain, after repeatedly denying that he had borrowed the rifle at all, at tape three, page 28, he finally admits borrowing it for two days. And at page 29 to 30, he claims it was before they went to California the end of June. The officers continued. But that was not the time period when the murder occurred. No, no. But the officers continue in on that discussion. And then at tape four, pages 18 to 29, he admits that they borrowed it to experiment with a silencer. He said they gave it back a couple of days later. And then two or three days after that, Karakachi had displayed it during some kind of a gang confrontation at a Whataburger parking lot. If the interrogation had stopped at that point, that would not have connected him to the murder to the extent that the further questioning did. Right. But I hadn't finished. Right after that, he said, and this was about a week before the rifle was found in Karakachi's car by the Luke Air Force Base military police officer. That was on August 21st, 12 days after the murder. So a few days plus seven days brings us right to the relevant time frame. So within three hours, he had admitted that he borrowed the rifle during the relevant time frame. Counsel, maybe I didn't make my question clear. Based on what you just said, he places himself at the crime scene at some point during the interview. Yes. He admits to having possession of the murder weapon at or about the time the murders occurred. And I read a list of other factors that I found. Did I miss any? Is there anything else that corroborates the fact that he was involved? Yes. There are a lot of other things. First off, he made admissions to four friends or acquaintances. Far more damning than the self-exculpatory statements he made to the officers. He admitted to his girlfriend, Vicki Jones, that he and Garcia committed the murders. He admitted to his friend and ROTC member, Brandon Berner, that they committed the murders, ROTC member Ben Linegar, and also his friend, Angel Roulette. And this is detailed at pages 33 to 35 of our brief. And these admissions have him actually doing the killing. Again, what he told the officers was simply that, I was there, I didn't participate in the murders or the robberies. These guys did it on their own and I was scared. Doesn't the fact that the jury convicted him of felony murder mean that they relied on his statements that were in the confession that was introduced in order to do that? Because the facts he admitted during the course of the interrogation would lead to a conviction of felony murder, but the story that Garcia gave would have Judy there actually doing some of the shooting, which would mean he would be just liable for murder. Well, both, both. Murder one. In answer to that, it's a real debate whether what he said during that statement would be enough under Arizona law to make him guilty of felony murder, because he said, you know, I followed them in. The jury found that he was guilty of felony murder. Right, but they could have found that based upon the physical evidence, the statements. But typically, I mean, you know, the shooter is usually not convicted of felony murder. The shooter is convicted of murder. In Arizona, they're. How about the virtue of having a felony? Well, felony murder. Participated in a felony, yeah. Felony murder is a lot easier for a jury to decide. If the robberies were committed, they don't have to get to the sometimes troubling issue of premeditation, reflection, all that stuff. In fact, when the prosecutor argued in closing to the jurors, he told them, well, we think he's guilty of both premeditated and felony murder, and you should find guilty of both, but it doesn't really matter. Either way, he's guilty of first-degree murder. Counsel, did I understand you to say five minutes ago that there was no confession? There was no confession, absolutely not. What are we doing here? The state court said, I thought, duty confessed voluntarily. That's what they seem to have been reviewing. Well, they used the word confession, but these are certainly admissions. It's an incriminating statement when he puts himself there. It's a confession that we're reviewing to see whether it's involuntary, which the state court seems to think we were doing, or we're not reviewing a confession. I'm just trying to find out what we are here for. You're reviewing the admissibility of his statements, whether you call that confessions or statements. Was the state court wrong in calling it a confession? I believe so. I believe it was used in the vernacular. You mean we could actually disagree with the state court? I just – if you read or listen to the tapes, this is not a confession in the classic sense. It was an admission against interest. Well, maybe not in the classic sense. Yes. Is it a confession in the non-classic sense? No, I don't think it is a confession in any sense of the word. All right. So we know at least the state court was wrong about that. I think it used the wrong word in refusing. Well, maybe it was wrong about other things, too. It was not. Obviously, that's my position. That was all it was wrong about, thinking it was a confession. What about the Miranda warnings? You said a little while ago it's sort of solid. Yes. Let's talk about that for a bit. Doody makes three arguments regarding the Miranda warnings. The first is that he was not adequately advised of his Miranda rights because Detective Riley did not read the parentheticals on the Miranda juvenile waiver form. He also claims that it wasn't sufficient because Detective Riley downplayed the significance of the Miranda warnings. And he finally claims, and I think we've discussed this, that he was somehow demirandized when Riley continued, the officers continued to question him during long periods of silence. We know from Egan and Preissach I think the argument was that the warning he did get didn't comply with Miranda because it seemed to suggest that he would only get a lawyer if he was guilty. That's, yeah, that's the third right. I will explain that. It didn't sound like any of the ones you listed. No. Well. So let's talk about that one. Okay. Excerpt of record item 91. The three, the four Miranda rights are listed, one, two, three, and four. Well, let's talk about what he said. Okay. He said, and this is, first off, he reads. ER-52, right? ER-52. He first reads, you have the right to have an attorney present prior to and during questioning. He read that to him. And then if you see the parenthetical following that, it says, it explains in kind of lay terms what an attorney is. And part of it says an attorney is a lawyer who will speak for you and help you concerning the crime which we think you have done. The problem was, at that point anyway, they didn't think he had done a crime. They didn't think he had committed a crime. They were simply trying to run this lead to ground. But doesn't it sound like he wouldn't have the lawyer if he hadn't committed the crime? I think that's a tortured reading of the explanation. But even if that could be true, Egan tells us that that doesn't make it invalid. What happened in Egan was he was told much like this, you have the right to counsel prior to and during questioning. And then he was told, you have the right to an attorney if and when you go to court. Well, the lower court said, well, that's... In Egan, he said nothing that was wrong and nothing that was untrue. Well, he said if and when you go to court, you have a right to counsel. But he had earlier told him... No, he didn't say that. He said it will be appointed to you if and when you go to court. Yes, yes. It doesn't talk about a right to counsel. It doesn't condition the right to counsel. It says we can't appoint counsel here. You will have a counsel appointed. Right. Which is true. You want a lawyer. You'll have to wait until you get to court. And then they say, if you want to talk, you can, and you can stop talking at any point. Right. Whereas this, what the excerpt here from the transcript seems to me like he's saying, if you're guilty, you get a lawyer. So, you know, if you want to ask for a lawyer, you know, pretty much you're telling us you're guilty. So, you know, go ahead and, you know, and it's not at all clear. This is not like the sort of true statements in Egan. Well, I think he's initially told you have the right to counsel practically. I mean, again, he's trying to explain this in lay terms. You can't be told you have a right to counsel. By the way, we're kidding. You really don't. Well, that's what's happening. You have to sort of look at the whole thing that he's told and see whether in the end you're left, you know, it's a clear statement that he is entitled to a lawyer and it's an indefeasible right. And I don't get that from this excerpt. Why don't you persuade me otherwise? I can try. I can try this. Again, I think in Egan you had the same situation. I will. Do it now. I'm going to. Again, in Egan you had the same situation where the defendant's told you have a right to counsel prior to and during questioning. Then he's told if you can't afford counsel, counsel will be appointed for you if and when you go to court. Well, that same argument was made there that, well, by telling him you have the right to appoint a counsel if and when you go to court, that's telling him that that's contradicting what the officer just said is that you have right to counsel prior to and during questioning. Yeah, but there it wasn't true. We're talking about – Well, that's not – I'm talking about Egan. It's a Supreme Court case. Why don't you persuade me about this, what this says? I mean, where do you get the indefeasible right to have a lawyer, which is what Miranda calls for? I don't see it. It says you have the right to have an attorney prior to and during questioning. I'm reading from ER 52. And what that means that if you want one, you're allowed to have a lawyer here before and during you know my questions to you. Okay. And then he goes and explains a lawyer. And then a lawyer – an attorney is a lawyer who will speak for you and help you concerning the crime or any kind of offense that we think you or somebody else was involved in if you were involved in it, okay? Again, not necessarily mean that you are involved, but if you were, then that's what – that would apply to you and you understand that. Now, obviously, that's not great language, but under Egan, that is good enough to advise him of the right to counsel prior to and during questioning. How? Because he – I mean, just saying it doesn't persuade me. I mean, how is this anything like Egan? This seems to say if you – it says two things that are not true. One of them is you have a right if you were involved in it. And it clearly says that. And then it says, again, it's not necessarily mean that you are involved, but if you were, that's what would apply. If you were involved, that would apply. So I don't – what is it that would apply? What is he talking about there? Well, I think we're splitting hairs. I think he was – Well, why don't you answer my question? What is it – what is the reference there? That's what would apply, okay? What is it that he is referring to? The right to counsel. Okay. So the right to counsel would apply if you were involved, if you are involved. So where does it say even if you are not involved, you are entitled to a lawyer? Well, I think, again, the confusion is because he's trying to explain this parenthetical in the situation where they don't believe at that point he is involved necessarily in criminal activity. There is confusion. There is some confusion. But, again, the bottom line comes up. Why isn't that it? Why isn't that the end of the case? Because Miranda rights are supposed to be clear and unequivocal. There's not supposed to be confusion when they give the rights. I mean, the Supreme Court has said exactly what you're supposed to say. You're not supposed to say more stuff. You're not supposed to take it away from it. Right? That's what the Supreme Court said. Here, that's where we're going to write it down. Look in the Constitution, and there are all the things you need to say. Well, it's not in the Constitution, but it's been constitutionalized. I agree with that. But Egan and Price – No, I was kidding. Egan and Price – I was embellishing. Okay. But clearly what the Supreme Court requires if you say that. It doesn't say, and by the way, we really don't mean it. You can't say that, right? Well, Egan and Price – You can't say we don't really mean it. They can't say that, no. But Egan – Why don't they say that here? Why isn't that what this says is we don't mean it? You only have the right if you were involved. Well, again, I think we're splitting hairs by reading that to tell him you only have the right to cancel. I asked a question. Why? That's not splitting hairs. That's an opportunity for you. And this will be my last opportunity to you to tell me why this does not say you only get a lawyer if you're involved. Because this claim was presented to the Arizona Court of Appeals. They considered what was said. They considered what was written on the form. They considered the officer's testimony, and they made a determination that the defendant was adequately advised of and waived his right to have counsel present prior to and during questioning. And what kinds of review were they – Unreasonable. Were unreasonable.  Yes. And I do not believe this is unreasonable. That's your answer? That's my answer, that the Arizona – You think that this does or does not advise him that he's entitled to a lawyer even if he's not involved? It does, yes. And where is that? It's right in the right that was read to him. It's admittedly toward the end of that explanation. It's a little confusing. But I don't think it tells him, oh, and by the way, you're only entitled to an attorney if you're guilty. Does the Court of Appeals have the same record? Yes. Yes, they did. I guess you're saying that sometimes negatives aren't pregnant. Well, I think – Or might not have been. Right. I think what the problem is here is this – whoever wrote this juvenile Miranda waiver form, the parentheticals in it probably didn't do a very good job of it. And the officer was doing the best he could given the circumstances he found himself in. Now, what do we know about the form vis-à-vis this statement? Was the form signed? Does he sign these initials as he is being given these rights? Yes. If you read the transcript or listen to the tape, as Detective Riley goes through, he asks him to initial yes or no. So if he initials under the inducement of the transcript, and if contrary to what you say, I look at the transcript and it looks to me like unequivocally what he was telling me, you only get a lawyer if you're involved, then his signature on this wouldn't change that. I think it would. It would make no difference, right? I think his signature would alleviate your concern because it specifically there makes it clear that you're not – we're not saying you're only entitled to counsel if you're guilty. So I think – So if you have a form, and as he's signing, he says, let me explain these rights to you, and he goes through this right to a lawyer, he says, by the way, you understand, this says what it says, but the truth is you only get a lawyer if you're guilty. That's okay because he signed the form that doesn't have that explanation. It's not okay, Judge Kaczynski, but I disagree with your characterization of what – No, no, I said what if. You know, what if – What if, then no, it would obviously not be an adequate lawyer. Okay, so the explanation has to sort of be important in the form because he signs the initial. The initial is the form based on the explanation given to him. That modifies the form to an extent – to an extent we think it's different. I don't think it modifies the form. I think the form – Well, you just said it did because he says it. We don't mean it. What the form says is it does modify the form. Maybe I'm all confused now, Judge Kaczynski. And you've only been at this for about half an hour. I know. Does head pedeference apply to the State Court's reading of the sufficiency of the Miranda warning? Okay. Right. Could you say that again? Does head pedeference apply to the State Court's reading of the sufficiency of the Miranda warning? I think it does, particularly if there's some ambiguity. Yes, it does. The bottom line is, is it a reasonable interpretation of Supreme Court precedent to say that this was an adequate advisement and waiver? And, Judge Reimer? That's okay. You're out of time. I had a question. Sure, Judge Collins. Did the Arizona Court of Appeals address at all the special caution that is to be undertaken when a juvenile is being questioned? Yes, it did cite the cases, and it did discuss them briefly at the beginning, I believe. I can put my finger on it here. Yes, at ER 14. What page is that of the Court of Appeals decision? Oh, I don't have the Arizona Reporter, but it's page 7 of the printed one at ER 14. It quotes State v. Jimenez, which talks about the greatest care standard and that kind of thing. But it only quoted the case. It didn't really apply it to the facts here, did it? I believe it did in applying to tally the circumstances. It considered his age, the fact that he had no prior experience with the ---- It discussed specifically the care that's to be taken when a juvenile is the subject of the interrogation. I think it did to the extent it discussed the fact that he was advised of having his parents there. He didn't want them there. It also noted that he was a 17-and-a-half-year-old emancipated minor and that he was living an adult lifestyle. But it did consider that. All right. Thank you. Okay. Questions? Okay. We'll hear from Butler. With respect to your last question, Judge Rawlinson, I don't ---- There was a mention of the care that a juvenile's confession is entitled to, but there wasn't that care exercise. And, in fact, the court of appeals kind of passed the buck. It said it was reviewing the trial court's decision for abuse of discretion, and, of course, it also referred to the jury's role. And it's interesting because the trial court himself had some doubts about the correctness of his voluntariness ruling, and he expressed the view after the verdict in this case that the voluntariness ruling be looked at with special care by the court of appeals, and I don't think it got that. With respect to the government's, the State's argument that Jonathan Judy was not a suspect when the questioning began, I think the State is dancing around with that a little bit. When the interrogation began, the cartouche had already told the State that he had loaned the rifle to Judy at the time of the Temple murders. And, in any event, even if he wasn't, assuming our uendo that he wasn't a suspect when the interrogation began, he certainly became one at some point, and, nevertheless, he was never warned again. Garcia, in contrast, was given Miranda warnings twice. Is there a law that says that you have to give the warning twice? Well, I think that if the State is going to defend these particular peculiar warnings on the ground that he wasn't a suspect so that it would have been misleading to tell them that he was a suspect, then I think they have an obligation to warn him. This is a juvenile. I don't think you're answering my question. I'm sorry. I said, is there a law that requires a second warning? And, by law, I meant the only law that counts in this proceeding, which is a holding of the Supreme Court. Well, I think there's law that an individual is entitled to Miranda warnings during a custodial interrogation. The State, Miranda. What case holds that once an individual has been given a Miranda warning, he's entitled to a second Miranda warning when the police, after initially being agnostic, decide that he's probably guilty? I can't give you a site off the top of my head, but I know there are cases where Miranda warnings are given more than once, when there's been interruption in interrogations, when something has happened between the beginning of the interrogation and the end. And if you'd like, I will submit a 28-J letter on the subject, if that would. Ms. Iger, what's your response to counsel's pointing out to us that your client made admissions to non-police officers for friends, that he was involved in the murder? There were jokes, and I don't think they were very funny, but people said that he had said after the murders that he had committed them, that he and his father were assassins, that they worked for the Office of Special Investigations. These were considered by the persons to whom the statements were made as not serious statements. And Brandon Berner, who was the friend that he originally said he was going to the movies with, said he told him a week before that he wasn't going to be available on Friday. And he identified a CD with a busted ejector button CD player as his when it came from the temple to Tim DeVern. I'm sorry. I don't think there was any temple loot found in his possession. And with respect to the statement to – I didn't say that. I'm sorry, then I misunderstood. He identified a CD player that had a missing eject button that Myers had given him, but Doody identified it as his. That Myers had given him, but – But Doody identified it as his. That's mine. I would have to double-check the record on that, Your Honor. I don't remember it specifically. But here I think we're talking about the breadth standard, and I don't think there's any argument that this is harmless error. The prosecutor argued that Doody could be convicted on his confession alone, and I know we're not calling it a confession now, but that's what the prosecutor called it in summation. And the jury did not believe the testimony of Alex Garcia, because Alex said that Doody had preplanned this weeks in advance, went in with the intention of killing the monks, and the jury did not buy that. And I think the harmless error issue is a – I think we win on the harmless error issue. The prosecutor having argued in his opening and his summation that you could convict on the confession alone, and we know that confessions are very compelling evidence in cases. If I may have – I would just like to speak for a moment about his signature on the Miranda form. There is no State court finding either that he read the form. He read the information developed for purposes of sentencing, showed that he read it at a fourth-grade level. I think that the – that if you listen to the tape, there are no pauses during which he is reading the – reading the warnings. MS. GOTTLIEB Is that part of the suppression hearing record? It's not part of the suppression hearing record, but I would say this. It's the – the presumption is that a – the confession is involuntary. It's the – it's the State that has the burden of proof on the matter. So I would say that to the extent that the State court record does not contain evidence on a particular point, like his reading level or education, then that's something that should be held against the State because of where the burden of proof is, and that's a constitutional burden of proof. That's a lot to ask. I mean, you know, there are all sorts of possible reasons why somebody might not be able to understand or hear or read something, you know. They didn't prove he wasn't blind, you know. They didn't bring in evidence, you know. It's a possibility, but – But in this case, Your Honor – Did they disprove everything? In this case, Your Honor, they were on notice. They knew his background. They knew he was Thai. They knew his family. They knew he wasn't born in the United States. They knew he was – he was Buddhist. They knew his family.   He spoke the language pretty well from his family, you know. Well, you know, I'm not a neurosc – Some of us. I'm not – His accent's even lighter than Judge Kuczynski's. Well, he doesn't have a heavy accent – I didn't call that a pained face. He doesn't display a heavy accent, but he also does not – He's also quite fluent. I mean, I'm – I mean, just from looking and listening, he seems quite fluent. He doesn't seem like somebody who's struggling with a foreign language. Well, Your Honor, he has trouble with pronouns, with tenses, and I'm afraid I'm going to refer to some information at sentencing. He left Thailand when he was – Well, his father died when he was four. His mother left. She returned for him three years later. She took him to Germany. But how can we consider information at sentencing in determining the voluntariness of the confession? Aren't we restricted to the record that was before the Court at the time of ruling? Well, I would suggest that the Supreme Court has listed or identified factors which a court must consider in assessing voluntariness, and the Supreme Court has also held that it's the constitutional burden of the State to prove at least by a preponderance of the evidence. So where there is no evidence on the record as to those factors, I think you'll hold it against the State. Thank you. Thank you. The case is now in your witness' hands for a minute. You are adjourned.
judges: En Banc Panel: Kozinski, Schroeder, Fletcher B. , Pregerson, Reinhardt, Rymer, Kleinfeld, Thomas, Wardlaw, Tallman, Rawlinson